JOHN WILLIAMS v. THE STATE.

1. MURDER — INDICTMENT. — The case of *Wilkerson* v. *The State*, 2 Texas Ct. App. 255, cited, and the ruling approved that an indictment for murder need not allege in what particular part of the body the mortal wound was inflicted.

2. SAME. — If the name of the deceased be unknown, the settled practice is to describe him as "a certain person to the jurors unknown." "One —— Miles, whose Christian name is to the grand jurors unknown," is a good description of the deceased in an indictment for murder.

3. SEE evidence held sufficient to sustain a conviction for murder in the first degree.

APPEAL from the District Court of Hunt. Tried below before the Hon. G. J. CLARK.

The indictment was found October 20, 1870.

The opinion states the facts of the case.

*Bennett, Ballinger & Bennett,* for the appellant. There is no general rule defining what circumstances will authorize a conviction, but it must be sufficient to satisfy the mind and conscience of the jury to a moral certainty and beyond any reasonable doubt; and this is subject to

the revision of the court.    *Henderson* v. *The State*, 14 Texas, 572.    And it seems that in no case shall a party be convicted on circumstantial evidence where direct and positive evidence is withheld by the prosecutor, for, where direct evidence can be procured, circumstantial evidence is of the nature of secondary evidence, and is inadmissible.    1 Stark. on Ev., 515 ; *Lewis* v. *City of San Antonio*, 7 Texas, 311 ; 14 Texas, 51 ; and 1 Greenl. on Ev. 84.

The record shows conclusively that there were not less than three eye-witnesses to the fatal shooting, and all within a short distance of deceased.    The wife of deceased, James Cheek, and Buck Leonard were all there, and yet not one of them is brought forward to testify, and make conclusive the very doubtful circumstantial evidence alone relied on by the state.    Jackson and Wilkins both testify that the sound of the report was from near the deceased, and that they, immediately after hearing it, saw defendant riding along, and not fast, some forty yards from deceased.    If John Williams (defendant) did the shooting, then both Jackson and Wilkins were mistaken as to the direction of the sound ; which might have been plausibly argued had they been at the same point, but not probable.    It cannot be well maintained that defendant fired the shot near deceased, and then rode off to where first seen, for Jackson testifies that on hearing the firing he at once looked in that direction, saw deceased stagger and fall, and, casting his eyes around, saw the defendant forty yards off.    Then, considering the great importance of certainty on this point, we submit that in justice to the accused, and to fulfill the requirements of the law, the prosecutor should have made every reasonable exertion to procure the evidence of an eye-witness to the shooting, who could with absolute certainty point out the guilty person, and relieve the jury of the necessity of relying on doubtful inferences in order to fix the guilt on the accused.    To establish as a precedent the rule that the

prosecutor may, at his option, withhold direct testimony, and compel a jury to give a verdict on circumstantial evidence — always invested with some degree of uncertainty — we think would be a decision of questionable propriety, and not in consonance with the spirit of our statute or Bill of Rights; and in a case like this, where the proof shows that deceased was near several other persons besides defendant, and some of them on unfriendly terms with him, and with equal opportunities of doing the killing, it seems an imperative duty that testimony free from doubt, if procurable, should have been introduced. 1 Greenl. on Ev., sec. 84; 7 Texas, 313.

The evidence shows that Mrs. Miles, Buck Leonard, and James Cheek saw the killing, or were in a position to have seen it, and we submit that they, or at least one of them, should have been placed on the stand, or good reasons given for their absence; they could tell of Miles' weapons, as well as the unaccounted-for bottle of brandy.

A presumption, in law, is not as strong as a *prima facie* fact. In a civil suit *prima facie* proof may be acted on; but not so with a mere legal presumption — a presumption only creating a probability inconclusive in itself. Burrill on Cir. Ev. 89. The law will not permit an inference to be drawn from an inference. Burrill on Cir. Ev. 138.

Where probable proof is brought of a state of facts tending to criminate the accused, the absence of all evidence of a contrary kind is to be considered, though alone not entitled to much weight, because the *onus probandi* is on the accuser to make out the whole case by substantive proof. Burrill on Cir. Ev. 167. Note the similitude between this case and the one given, in the books, of the man rushing out of the house with a bloody sword in his hand. 1 Stark. 538, and side page 274, and other cases there referred to.

In all criminal cases it is essential, in order to sustain a verdict of guilty, that the guilt of the accused should be

fully proved. Neither a mere preponderance of evidence nor any weight of preponderant evidence is sufficient; the evidence must generate full belief of the fact, to the exclusion of any hypothesis consistent with the innocence of the accused, and must remove all reasonable doubts of his innocence. See Burrill on Cir. Ev. 212; 1 Stark. on Ev. 478, 514; also *Henderson* v. *The State*, 14 Texas, 514. We think from the evidence that a hypothesis consistent with the innocence of accused could be reasonably assumed, and while the preponderance of evidence might point to him as guilty, yet the hypothesis of his entire innocence is not overthrown, admitting all the facts proven to be true.

We submit, as an additional cause why this case should be reversed, the fact that the jury were compelled to rely on (as we think) an unwarranted presumption in order to convict of murder in the first degree. The transcript shows that the state proved that these parties had quarrelled the night previous, and that next morning, on their both going out of the grocery, the deceased was killed, and with circumstances going to show that defendant did, or may have done, the killing; and that the state, after proving this much, rested, relying on the presumption of there being malice by proving the killing. Now, while we admit that proof of killing raises a presumption of malice, and is sufficient to ordinarily sustain a verdict of murder in the second degree, yet in this case, from all the facts detailed, we think this legal presumption of killing through malice is neutralized, if not entirely removed, by the proof of the conduct of the parties prior to deceased's death. The evidence shows that deceased was under the influence of whisky, of a quarrelsome disposition, and one who, when angered, would attempt to kill his antagonist, and also shows that he had been irritated by defendant, but ten or twelve hours before, so highly that he had attacked him (defendant) with deadly weapons, and made threats to kill. Now, these parties

being again thrown together under this condition of things, is it not with more reason that we should presume, on finding deceased killed by the hands of defendant, that he had done the killing to protect himself from deceased, who had again assaulted him in a renewal of their former quarrel, than to presume defendant had killed him without sufficient provocation, through revenge at his former inhuman treatment by deceased? Does not the peaceful conduct of defendant throughout the entire matter rebut the idea that he had become the aggressor, and justly lead us to believe that all acts done by him were only for his protection?

But in this case even the proof of killing, without any facts to rebut the presumption of implied malice, will not sustain the verdict; for, it being for murder in the first degree, there must be conclusive proof of express malice, and we would call attention to the evidence on this point, particularly, deeming it inadequate to fulfill the requirements of the law. Even, for the argument's sake, admitting that defendant did the killing, then there immediately arises two theories to account for it, and we contend that the one relied on by the state is less plausible than that in favor of defendant's innocence. No testimony is produced to show the conduct of the parties at the time of the killing, and for a solution of its cause we are compelled to reason from the prior acts and words of the defendant and deceased. The state assumes, from the difficulty on the night before between the parties, that defendant, filled with malice towards deceased, had gone off and armed himself, came back, and on the next morning sought his chance to murder deceased, and did kill him in subservience to his preconceived design. The defense, reasoning from the acts of the two men, assumes that they incidentally met next morning at the grocery, a place frequented by both; that, being still under the influence of the night's dissipation, they bought a bottle of

brandy, and started for deceased's house for the purpose of drinking it and making friends over their former quarrel; that on the road there they again broached the subject of their previous row, and deceased, becoming again angered, attempted to repeat his attack of the night before on defendant, and that defendant, in self-defense, killed deceased. In support of this theory the defense refers to the peaceable conduct of defendant on the night previous; though brutally assaulted and endangered, yet making no counterattack on deceased; and next day, on meeting deceased in the grocery for the first time after having had his life threatened, and the attempt being made to put it in execution, the evidence shows him still quiet and making no effort to revenge the treatment of the night before, and overlooking his injuries of the night previous; in fact, not uttering a word or doing an act showing that he was harboring thoughts of revenge. The character of deceased further bears out this theory of the defense, for he was quick-tempered, quarrelsome, overbearing, and liable on slight provocation to attempt the life of those who angered him; and we find him on this morning still drinking, and quick to become angry, being still in remembrance of the row of a few hours ago.

We submit that the court below erred in its charge to the jury in charging this: "That, in order to justify the killing upon threats, the party killing must show that the deceased did some act that would induce a reasonable man to believe his own life was in danger, or that some great injury would result to his person, and before killing he must have resorted to every other means to save his own life." See *Horbach* v. *The State*, 43 Texas, 258.

The court erred in overruling the third cause assigned in the motion for a new trial, because there is no proof of express malice, the evidence being all circumstantial. *Hamby* v.

*The State*, 36 Texas, 526; *McCoy* v. *The State*, 25 Texas, 33; *Maria* v. *The State*, 28 Texas, 698; *Ake* v. *The State*, 30 Texas, 473; *Sanders* v. *The State*, 37 Texas, 710.

*S. D. King*, also for the appellant.

*George McCormick*, Assistant Attorney General, for the State.

WHITE, J. When this case was formerly before this court, upon appeal from a judgment of the lower court refusing bail to the appellant, it was said: "We call the attention of the county attorney specially to the indictment in this case, and suggest that a new one might, perhaps, obviate any objections to its sufficiency by setting out more particularly the portion of the body upon which the mortal wound was inflicted," citing *Smith* v. *The State*, 43 Texas, 646, and *Nelson* v. *The State*, 1 Texas Ct. App. 41. See *Williams* v. *The State*, 1 Texas Ct. App. 465.

Since that opinion was delivered the question as to whether or not, in an indictment for murder, it was necessary to allege in what particular portion of the body the mortal wound was inflicted has been directly presented to us for adjudication, and, after mature consideration, it was held that the allegation, under our law, was not essential to the validity of the indictment. *Wilkerson* v. *The State*, 2 Texas Ct. App. 255.

Another objection to the indictment, set forth in the motion in arrest, is "that the indictment does not set out the Christian name of the party charged to have been killed; nor does it give to him any fictitious name, nor give him any description upon which his personal identity might be proved before the jury." The charge, as stated in the indictment, is that the defendant " did, in and upon one — Miles, whose Christian name is to the grand jurors

unknown, feloniously, willfully, and of his malice afore-thought, make an assault," etc.

Our statute, in prescribing the requisites to an indict-ment, provides that "it must contain the name of the accused, or state that his name is unknown" (Pasc. Dig., art. 2863, subdiv. 4); but there is no similar provision, that we are aware of, with reference to the name of the party injured. In cases, however, where the name of the injured party is unknown, the practice seems to be well settled that it is enough for the indictment to charge them as a "cer-tain person, or persons, to the jurors unknown." 1 Whart. Cr. Law, sec. 251. Mr. Bishop says "if the name of the deceased is unknown to the jurors by whom the indictment is found, it may be so alleged." 2 Bishop's Cr. Proc., sec. 507, citing 2 Hawk. P. C., ch. 23, sec. 78.

Our Supreme Court have held that "an indictment, charging an assault upon one ———, a freedman, whose name is to the grand jurors unknown, is good." *Elmore* v. *The State*, 44 Texas, 102, citing *Cochrane* v. *The State*, 26 Texas, 678; *Prior* v. *The State*, 4 Texas, 383; *Phil-lips* v. *The State*, 29 Texas, 235.

A case directly in point with the one we are considering is *Bryant* v. *The State*, where it was held that an indict-ment charging that the defendant killed —— Butler, whose Christian name is to the grand jury unknown, is suf-ficient. 36 Ala. 270.

The other questions involved in the case are as (1) to the correctness of the charge, and (2) the sufficiency of the evidence.

Though unnecessarily labored as to some of the questions presented, we believe that the charge, taken as a whole, fully submitted to the jury the law applicable to the facts of the case. Three additional instructions were asked by defendant and refused by the court; the two first of which, we are told by counsel, in their interesting brief filed in this case, were

copied from *Roseborough* v. *The State*, 43 Texas, 570. As
we conceive, the court had, in its general charge, substantially
given the law as expressed in these instructions, and, there-
fore, did not err in their refusal.

But the main ground relied upon by defendant's counsel for
a reversal of the case, both in the oral argument and brief, is
the sufficiency of the evidence to support the verdict and
judgment. The facts are substantially that, the evening
before the homicide, defendant and deceased, who was drunk,
met at Jackson's grocery, where a difficulty occurred between
them about some money the deceased owed to a third party.
Defendant was a young man about seventeen years of age,
and deceased, who was much stouter, was a grown man
between twenty-five and thirty. After some words, deceased
struck defendant a violent blow. Defendant was then taken
out of the house by Jackson. He insisted upon coming back,
and was finally let in by Jackson, when the difficulty was
renewed, and deceased cut at him with a knife. Jackson
again put defendant out of the house; the deceased saying,
with an oath, that, "if he had not killed him, he would kill
him." It was also proven that deceased was a dangerous
man when drunk. Next morning, about nine o'clock, the
parties again met at Jackson's grocery, the deceased in his
shirt-sleeves, and unarmed, and defendant with a six-shooter
belted around him, his horse, ready saddled and bridled,
tied to the back door of the grocery. Nothing was said
between them until deceased said: "Johnnie, I will get a
bottle of this fine brandy and we will go down to my house and
sober up, and get all right." Defendant made no reply.
Deceased got the brandy and started home, which was but a
few yards distant, by way of the south door. Defendant imme-
diately went out of the north door, mounted his horse, and in
a very short time a pistol or gun-shot and scream were heard.
When Wilkins, who was keeping the grocery, walked to the
front door, he saw deceased lying in the path leading to his

residence, and about forty yards from him he saw defendant riding off in a fast trot or gallop, and saw him bow his right arm, as if putting it about the belt or waist-band of his pants. Deceased had been shot by a pistol or rifle-ball, below the left-arm pit, and was killed almost instantly. The defendant was not seen in that neighborhood but seldom after the homicide, and though the killing took place November 15, 1868, he was not brought to trial until January 20, 1877.

This evidence is, to our mind, conclusive that he, the defendant, and no one else, took the life of the deceased, and that the murder was a willful, deliberate, and premeditated assassination. There is no error in the record calling for a reversal of the case; the judgment of the lower court, affixing the punishment of defendant at imprisonment in the penitentiary during his natural life, is, therefore, in all things affirmed.

*Affirmed.*